# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>V.<br><br>PHILIP BOORKMAN,<br><br>Defendant. | No. 23-5085-DHE-19<br><br>DEFENSE SENTENCING MEMORANDUM |

**ATTACHMENTS:**

1) Psychological evaluation (filed separately under seal)

2) Personal Statement Of Philip Boorkman

3) Letter of Support – Deondra Boorkman

4) Letter of Support – Jami Spies

5) Letter of Support – Everal Hernandez

6) Letter of Support – Jesse Hernandez

7) Letter of Support – Jordan Hernandez

8) Highschool Diploma Confirmation

# I. Introduction

Philip Boorkman comes before this court for sentencing. He plead guilty on January 28, 2025, to one count of conspiracy to distribute controlled substances, a class B felony. The mandatory minimum sentence is 5 years followed by 4 years of supervised release.

# II. Recommendation

The defense recommends that the court specifically recommend placement in RDAP and impose a mandatory minimum sentence of five years and supervised release for 4 years consistent with pretrial service's recommendation. This sentence is sufficient — but not greater than necessary — to affect the congressional sentencing objectives, and it is warranted by the best interests of the community and by Mr. Boorkman's personal circumstances.

# III. Facts

### A. Personal History and Characteristics.

This case comes before the court because of Mr. Bookman's severe and persistent addiction to drugs. Drugs have ravaged Mr. Boorkman's life. In his personal statement he has conveyed remorse for his participation in the distribution of a narcotic that has had a deeply negative impact on the community and his own life. He has lost friends to substance abuse, and described an incident that occurred at FDC SEATAC where an inmate overdosed in his unit. Mr. Boorkman noted that, "in reality I should be added to those numbers," referring to the statistics of lives lost to fentanyl. Mr. Boorkman has sought support through the MAT program while in

custody to address his addiction issues. Despite Mr. Boorkman's historic substance abuse issues he does have strong pro social bonds that will support his sobriety upon release.

The last time he spoke to his father was in 2003. The last time he spoke to his mother was in 2014. Mr. Boorkman has a fractured relationship with his younger brother due to his family history and substance abuse. However, his wife and their 4 children are eager to have Mr. Boorkman back in their lives. Mr. Boorkman's friend, Jami Spies, has overcome addiction and runs a successful business providing opportunities for people with extensive criminal history. These pro social ties will support Mr. Boorkman's continued sobriety and successful reintegration into the community upon his release from custody. Mr. Boorkman apologizes for his absence in their lives in his personal statement, and is eager to be a better version of himself for them when he is released.

Mr. Boorkman began experimenting with marijuana and LSD at a young age. He suffered significant emotional and physical abuse at the hands of his father and avoided being home by any possible means. He stayed with his grandparents as much as possible as a child. Due to the behavioral issues that developed Mr. Boorkman's parents determined it would be appropriate to send him to a behavioral modification camp. One day in 1998 Mr. Boorkman was awoken in the middle of the night by strangers and taken from his home by force. He was kidnapped and sent to a WWASP program in Samoa that was subsequently shut down for severe child abuse.

A report on October 16, 2006, stated that children housed in WWASP programs were denied adequate food, denied access to toilets, forced to eat their own vomit, chained in dog cages, and emotionally and sexually abused. [1] These programs were also the subject of a special

---

[1] https://en.wikipedia.org/wiki/World_Wide_Association_of_Specialty_Programs_and_Schools

report on the show 48 Hours.[2] Mr. Boorkman reported physical and emotional abuse during his time at Paradise Cove in Samoa. Mr. Boorkman was beaten and knocked unconscious by a staff member and left in a small sheet metal box he described as a chicken coup with no ventilation for 14 days. The director of the facility threatened that he would keep Mr. Boorkman there until he was 18 and his mother would never know. Mail and communications were closely monitored. Mr. Boorkman was only removed from solitary confinement at the insistence of a nurse due to severe illness and breaking out in hives all over his body. Mr. Boorkman had no ability to escape his circumstances on the island. Mr. Boorkman also reported knowing of and witnessing sexual assaults while he was in the program. Mr. Boorkman's account of his experience is credible, and the circumstances were truly horrific.

When Paradise Cove was shut down Mr. Boorkman was sent to another program in Utah run by WWASP. His mother ran out of money near his 18th birthday and he was finally freed from the program. By then the psychological trauma was immense.

Mr. Boorkman reports that when he left the program he suffered severe nightmares when he could sleep. He started using stimulants to avoid sleep. When he knew he would have to sleep Mr. Boorkman would use depressants to avoid dreaming. Mr. Boorkman's relationship with his family never recovered, and his drug addiction took a stranglehold on his life.

All of Mr. Boorkman's criminal history stems from his severe persistent drug addiction. Mr. Boorkman did make an attempt to enter treatment on his own accord in August of 2022. At the time he was living alone in a hotel and working as a welder. It was short lived because he had to relocate for work, but it does demonstrate a recognition by Mr. Boorkman of his underlying problem and a desire to change.

---

[2] https://www.youtube.com/watch?v=aWln8JuzD38

Mr. Boorkman needs therapy and chemical dependency treatment. He still suffers from nightmares and wakes with tachycardia as a result of his childhood trauma. Dr. Meredith found that Mr. Boorkman completed the Drug Abuse Screening Test (DAST), scoring 25 out of 28, well above the cutoff for concern regarding an active substance use disorder. Dr. Meredith also noted that Mr. Boorkman credibly suffers from PTSD based on his childhood trauma. Mr. Boorkman reported ongoing feelings of dysphoria and other depressive symptoms on a consistent basis throughout the majority of his lifespan. Providing structured support through RDAP will provide Mr. Boorkman with the framework and tools necessary for a successful reintegration upon his release from custody.

### C. Offense Conduct

The PSR well summarizes the allegations against Mr .Boorkman. Of note, Mr. Boorkman has no connection to the vast majority of the individuals listed in this indictment. The Government agrees that he has no connection to the Aryan Family Prison Gang or any gang affiliation. Mr. Boorkman admits he purchased narcotics from Mr. Kilp for redistribution. The amounts are minimal when compared to the broader investigation. Mr. Boorkman accepts responsibility for obtaining narcotics for redistribution, and credibly explained that this was largely done to feed his own addiction that prevented him from holding other gainful employment.

Mr. Boorkman likened purchasing narcotics from Kilp to going to Costco. He was buying in bulk to reduce the cost of feeding his own addiction and providing the excess to people at the time that he also did drugs with and considered friends. He dealt with a relatively small circle of individuals. Mr. Boorkman was personally consuming a minimum of 1 gram of

methamphetamine, a "handful" (without counting) of benzodiazepines, and 3-4 grams of fentanyl per day just to feed his own addiction. When Mr. Boorkman was arrested he had a small quantity of narcotics on his person for personal use.

## IV. Law

A.  *Sentencing Guidelines*

The advisory Sentencing Guidelines are the starting point for a district court's sentencing analysis. *Freeman v. United States*, 131 S.Ct. 2685, 2692, 180 L.Ed.2d 519 (2011).

Here, Probation calculated an offense level of 25 and a criminal history category of IV, providing a standard guideline range of 84 months to 105 months. The Government has agreed to recommend nothing greater than the bottom end of the range. Probation is recommending the mandatory minimum.

B.  *Reasons under 18 U.S.C. §3553(a) to Deviate from the Guidelines*

Ultimately, under 18 U.S.C. §3553(a), the court must "impose a sentence sufficient, but not greater than necessary," to comply with the purposes articulated by subparagraphs (2)(A) through (D).  Those four purposes are well known to the court and are addressed in turn below.

A)  *Just Punishment, Respect for the Law, & Seriousness of the Offense*

This was an unquestionably serious offense, but punishment for the sake of pain without any remedial purpose is not just. Too often, the justice system fails to appreciate the profound fear and emotional pain that comes from the prosecution itself. As it has in the case of Mr. Boorkman, the process of prosecution alone can do most of the work of promoting and instilling

respect for the law, especially in federal court where the potential sentences are massive and the machinery of justice is downright frightening. Mr. Boorkman has already been in custody for 30 months. A sentence of an overly lengthy term may have the unintended consequence of undercutting respect for the law. See Gall, 552 U.S. at 54 ("'a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing'")(quoting the district court).

Mr. Boorkman is currently 43 years old. Statistically, he has an expected life span of 74.8 years.[3] A frequently cited study concludes, "Incarceration reduces life span." *Patterson E. The dose response of time served in prison on mortality*: New York State, 1989 -2003. American Journal of Public Health. 2013; 103(3):523-528. Doi: 10.2105/AJPH.2012.301148. The reported results of the study show generally a "2-year decline in life expectancy for each year served in prison." *Id.* If Mr. Boorkman is sentenced to 84 months of incarceration his life expectancy is dramatically decreased to just 60 years. This would be an unintended but foreseeable result of a lengthy prison sentence at his age. The sentence should take into account Mr. Boorkman's age and the likely reduction of his life expectancy as a result.

   *B) Adequate Deterrence*

Longer sentences also do not deter crime.

> Some policymakers and practitioners believe that increasing the severity of the prison experience enhances the "chastening" effect, thereby making individuals convicted of an offense less likely to commit crimes in the future. In fact, scientists have found no evidence for the chastening effect.

Ex. 5 ("Five Things About Deterrence," National Institute of Justice, Pg 2 (2013)).

---

[3] **https://www.cdc.gov/nchs/fastats/life-expectancy.htm**

Instead, what works is establishing the certainty of being caught. *Id*. And here, that point has been made. Mr. Boorkman has been in custody since March 22, 2023. The research is abundantly clear – that absent some media or notorious attention, any sentence imposed on Mr. Boorkman will have no impact on the criminal conduct of *others*. *See e.g.,* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."). This is because potential criminals are not generally aware of penalties for their prospective crimes, do not believe they will be apprehended and convicted, and simply do not consider sentence consequences as one might expect of rational decision-makers. Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).

The Court should not emphasize general deterrence through punishing Mr. Boorkman. "Judicial punishment can never be administered merely as a means for promoting another good either with regard to the criminal himself or to civil society but must in all cases be imposed only because the individual on whom it is inflicted has committed a crime. For one man ought to never be dealt with merely as a means subservient to the purpose of another." Immanuel Kant, The Science of Right, 195 (W. Hastie trans, 1790).

C) *Protection of the Public*

Mr. Boorkman is eager to participate in meaningful treatment opportunities. He has taken steps to address his chemical dependency issues while in custody as well as addressing his underlying trauma. Mr. Boorkman will be supervised for a minimum of 4 years upon his release

and is willing to comply with a structured treatment program to support long term sobriety. He also has opportunities for gainful employment. If Mr. Boorkman can manage this underlying addiction issue he poses no future risk to the community.

### D) *Rehabilitation of the Defendant & Necessary Correctional Treatment*

The Defense respectfully requests that the Court specifically authorize RDAP. Mr. Boorkman is eligible for RDAP based on the findings of Dr. Meredith and his BOP health records. Mr. Boorkman is diagnosed with a severe substance use disorder as well as suffering from PTSD and has a history or depression and anxiety disorders. RDAP is designed to address the very issue that Mr. Boorkman presents to this Court: addiction. Treatment is recommended and necessary to give Mr. Boorkman the framework to continue on a path of sobriety and self-improvement.

## V. Conclusion

For the reasons discussed above, the court should sentence Mr. Boorkman to 5 years of imprisonment and 4 years of supervised release.

DATED: <u>SEPTEMBER 24, 2025</u>.

Respectfully submitted,

s/Tim Rusk
Attorney for PHILIP BOORKMAN

I certify that this memorandum contains **2,263** words, in compliance with the Local Criminal Rules.

1
2
3
4
5
6
7
8
9
10                                    EXHIBIT 2
11
12
13
14
15
16
17
18
19
20
21
22
23
24

DEAR JUDGE ESTODILLO,

I WANT TO TAKE THIS OPPURTUNITY TO TELL YOU HOW FENTANYL NEARLY DESTROYED MY LIFE. I WAS RAISED TO RESPECT MY ELDERS AND VALUE MY HERTIGAGE AND BECAUSE OF MY ADDICTION I HAVE BRAUGHT GREAT SHAME AND EMBARASMENT ON MY SELF AND ON MY FAMILY. IM NOT A GANG MEMBER AND THE FACT IM ASSOCIATED WITH A WHITE SURPREMIBEST CONSPRACY IS SOMETHING THAT IM DEEPLY ASHAMNED OF. IT IS NOT WHO I AM OR WHAT I BELIEVE IN. FENTANYL IS EVIL IN IT'S PUREST FORM AND IT KILLS NOT ONLY LIFE BUT HOPE AS WELL. IM SURE THE GOVERMENT WILL BE TALKING ABOUT ALL THE LIVES LOST DUE TO OVERDOSE AND IN REALITY I SHOULD BE ADDED TO THOSE NUMBERS AND I CAN PUT FACES TO THE STATISTICS OF FRIENDS WHO HAVE PASSED. I AM SO SORRY FOR THE PART I PLAYED IN HELPING SPREAD THAT DEATH TO PEOPLE WHO ARE HURTING AND LOST JUST LIKE I WAS. YOU ONLY HEAR ABOUT THE DEATHS BUT IT TAKES WAY MORE THAN LIFE IT TAKES YOUR DECENCY AND LOVE AND DESTROYS FAMILYS, IT TAKES FATHERS AND MOTHERS FROM THERE CHILDREN AND THE INNOCENT TOO. THERE IS NO HOPE WHEN I WAS ON

FENTANYL AND THIS INDITMENT SAVED MY LIFE. I WAS OUT THERE LIVING TO DIE AND I HAVE BEEN FIGHTING MY DEMONS FOR 30 YEARS AND LOOSING. IM CLEAN NOW AND ON THE MAT PROGRAM AND FOR SOME REASON I HAVE PEOPLE IN MY LIFE THAT STILL LOVE AND BELIEVE IN ME. IM SO THANKFULL I WAS STOPPED BECAUSE THAT DRUG IS BY FAR THE MOST DANGEROUS THING I EVER USED AND I HAD TO WATCH A FRIEND DIE IN MY UNIT FROM A OVERDOSE AND IT HAS BEEN A CONSTANT REMINDER ABOUT HOW DEADLY FENTANYL IS. I TAKE FULL RESPONSIBILITY FOR WHAT I HAVE DONE BUT I AM NOT A DRUG TRAFFICIER. I AM AN ADDICT AND EVERYTHING I DID WAS JUST TO STAY HIGH AND IT WAS MY SELF AND OTHER ADDICTS PUTTING OUR MONEY TOGETHER TO GET A BETTER PRICE. THAT IS THE TRUTH AND I WISH I WAS STOPPED SOONER. I AM DEEPLY SORRY AND MY FAMILY IS PAYING THE PRICE FOR MY CHOICES AND MY SON IS ANGRY AND ACTING OUT AND I CANT BE THE MAN HE NEEDS SO HE CAN BECOME A MAN HIMSELF.

MY SENTANCING GUIDE LINE RANGE IS THE THIRD LOWEST OUT OF 27 PEOPLE AND I AM

ASKING THAT YOU PLEASE TAKE THAT INTO ACCOUNT.
MY CHOICES ARE TERRIBLE AND I KNOW
I NEED TO BE HELD ACCOUNTABLE I AM
ASKING TO PLEASE ALLOW ME TO FINISH MY
TIME ON HOUSE DETENTION. THE TWO PEOPLE
WITH LOWER RANGES ARE OUT AND I WOULD
LIKE A CHANCE TO PROVE MY SELF AND ALSO
BE THERE TO HELP MY WIFE WITH OUR KIDS.
IT IS IN YOUR POWER TO GREATLY AFFECT
MANY LIVES I CARE DEEPLY ABOUT AND THERE
IS NO PUNISHMENT WORSE THAN WATCHING
THE PEOPLE I LOVE STRUGGLE. I KNOW I AM
NOT IN A POSTOTION TO ASK FOR ANYTHING.
PLEASE ACCEPT MY APOLOGY IT IS FROM MY
HEART AND THE ONE THING THE COURT DOES
NOT HAVE TO WORRY ABOUT IS ME GETTING
INVOLVED WITH FENTANYL AGAIN.

Philip Beck

EXHIBIT 3

Dear Judge,

I am writing this letter as a wife and mother who is doing her best to keep our family together during one of the hardest times in our lives. I am asking with all my heart for your compassion and consideration in allowing my husband, Philip Boorkman, to come home on home detention.

These months without him have been devastating for our family. Our son cries because his daddy is not there to walk him to the bus stop, and it breaks my heart to watch him struggle with that absence. My daughter, though not his biological child, has always considered him her father. She has had to miss out on father-daughter dances, and she dreams of him being there for her quinceañera—a once-in-a-lifetime moment she desperately wants to share with him. Our children need their father, and I need my husband.

I also want the Court to know that my husband has endured deep struggles in his life. As a young boy, he was placed at Paradise Cove in Samoa, where he was abused, including sexually abused. These traumatic experiences left scars, but despite this, he has worked to become a loving father and husband. With the stability and love of his family at home, I truly believe he can continue healing and moving forward in a positive direction.

Your Honor, if you grant this request, I promise to do everything in my power to make sure he follows every condition of home detention. I will personally support and encourage him to comply fully with the Court's orders. I will make sure he attends any required counseling, appointments, or programs, and that he uses this time at home to rebuild himself as a father, husband, and man. We want to show you that your trust would not be misplaced.

I respectfully ask that you allow him to serve his time at home, where he can be present for his children, where we can begin repairing the damage of this separation, and where he can continue his journey of healing.

Thank you for taking the time to read my letter and for considering this request. I am deeply grateful for your understanding and compassion.

With respect and hope,

Deondra Boorkman

1

2

3

4

5

6

7

8

9

10                              EXHIBIT 4

11

12

13

14

15

16

17

18

19

20

21

22

23

24

 Gmail

**Tim Rusk** <tim@timruskattorneys.com>

## Philip Boorkman Support Letter - Jami Spies
1 message

**Jami Spies** <jami@316insulationservices.com>                    Tue, Sep 23, 2025 at 10:41 AM
To: "tim@timruskattorneys.com" <tim@timruskattorneys.com>

*Jami Spies* | Estimator
**316 Insulation & Spray Foam**



**c: 253-247-2585 Call or Text**
Jami@316insulationservices.com
www.316insulationservices.com

———

A little summary about my family and I. My name is Jami Spies a friend of Philip,

I will make this part short and simple.
All my siblings and I were incarcerated for 2-7 years and struggled with addiction and drugs from 15 years old to 30. We are now owning and operating a family owned business, 8 years strong now. We have accountability and full responsibilities that keep us fully on track and striving to do the best we can. I am now a Home owner after 6 years of being out of incarceration. My whole family is caring and honest and feel as if we can be a great asset to his recidivism and help break the chains in his life. We have been employing men and women from incarceration and 90% stay with us and are doing great with work and life because we genuinely care about our crews and staff and believe in 5th chances. I've seen it work, my life and family is proof. Faith without works is dead, I have faith that this time he's got a fighting chance with the right support on his side.

**On my friends behalf,**

I am writing to respectfully offer my support for Philip Boorkman, who is currently awaiting sentencing in your court. I understand the seriousness of the charges and the consequences involved, and I do not write this letter to excuse any wrongdoing. My intention is simply to provide context about the person I know and the changes I believe he is truly ready to make.

I have known Philip for 10 years and in that time, I've seen both his struggles and his strengths. At his core, he is a loving, loyal, smart and a protective person. He has always shown deep care for his family and friends, and he has been a voice of reason in many difficult situations. I know that he is not defined by his past, but rather by how he chooses to move forward — and I believe he's ready to do just that. he has taking action in his recovery and staying out of trouble this time around during incarceration and taking alternative routes to seeking sobriety (never done before) He takes it upon himself to improve his physical health and  personal knowledge by reading.

One thing that gives me real hope this time is the **strong support system.**  I will help him when he is released by guidance and not just handing out hard earned items, these items provide a sense of self worth and cannot not be given. Unlike in the past, he will not be returning to the same environment or influences that led him astray. He will have people to help lead him — including myself — who are committed to helping him stay on track. He has access to stable housing in Clean and Sober living , emotional support though AA,Na, Church and Celebrate Recovery. Potential job opportunities with the company I work for, we will be there to hold him accountable and help him succeed.

He has taken responsibility for his actions and has shown a genuine desire to break the cycle and build a better life. I've had honest conversations with him, and I believe he truly understands what's at stake. He is ready to rebuild not only his own life but also the trust of those who care about him.

Your Honor, I kindly ask that you consider all of these factors during sentencing. I know that Philip Boorkman is capable of real growth and change, and with the support he now has behind him this time, I believe this could be a true turning point in his life. Thank you for your time and consideration.

Sincerely,
**Jami Spies**

EXHIBIT 5

Dear Judge,

My name is Everal and I am in 4th grade. I am writing you cuz I miss my daddy so much. It is very hard without him. Every morning I go to the bus stop and I see the other kids with there dads and I start to cry because my daddy not here to take me. Mommy trys to help me but it's not the same.

I need my daddy home. I need him to help me with my homework and play catch with me. When I see kids with there dads I feel so sad inside my heart. I don't understand why he cant come home to us. I just want him to be here, even if he has to stay home all the time.

Please Judge can you let my daddy come home on home detenshun. I will be so happy and I promise to be good. My sister needs him too for her big party, her quincenera. She crys too cuz she wants daddy to be there.

Please let my daddy come home. I love him so much.

Love,

Everal

1

2

3

4

5

6

7

8

9

10                                    EXHIBIT 6

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Dear Judge,

My name is Jesse Hernandez and I am 15 years old. I know Philip is not my real dad but to me he is the only dad I ever knew. He raised me and took care of me like I was his own.

Since he been gone I been real angry. I try to help my mom and be the man of the house but it's hard. Sometimes I feel like I gotta be tough all the time but really I just miss my dad. My grades been harder to keep up and I even got myself in a little bit of trouble. I know that's not the life I want and I don't want to go down the wrong road. I just need my dad here to guide me and keep me straight.

It hurts watching my little brother cry for him and my sister wishing he could be there. I try to act strong but inside I just want my dad home. Please Judge can you let him come home on home detention so we can have our family back. I know he can help me be better and stay out of trouble.

Thank you for listening to me. I just want my dad home.

Sincerely,

Jesse Hernandez

1

2

3

4

5

6

7

8

9

10

EXHIBIT 7

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Dear Judge,

My name is Jordan HernandezA and I am 14 years old. I just want to ask you from my heart if you can please let my dad come home. I miss him so much. It's really hard not having him here with me.

I always wanted to go to father daughter dances but I never got to because my dad wasnt here. When I see other girls with there dads at those things it makes me sad and I try not to cry but inside it hurts alot. My dad means so much to me and I just want him to be part of my life.

Soon I am gonna have my quinceañera and that is a really special day for me. Every girl dreams of having her dad there for it. I dream about him walking me in and dancing with me but if hes not there then my dream is broke. I dont want that day to come without him. Please Judge I am asking you please let him come home before then so he can be there for me.

I need my dad in my life, he is important to me and I love him very much. I promise I will be so happy and I will never forget if you let him come home.

Sincerly,

Jordan Hernandez

EXHIBIT 8

# Cornerstone Christian Correspondence School



This Certifies That

## Philip Andrew Boorkman

Has satisfactorily completed a Course of Study prescribed for Graduation
from Cornerstone Christian Correspondence School
and is therefore awarded this

## High School Diploma

Given at Unionsmd, Georgia this date

April 1, 2002



_____
President

_____
Administrator